Good morning again. Welcome. Glad to have you here. We have some interesting cases on today's hearing. We're going to pay attention to our time limits. Yellow light comes on when you have two minutes, and when the red light comes on, you are asked to conclude your argument unless you're answering a question of counsel. We've also read the briefs and record excerpts, so we may not—well, we certainly haven't read the record in this case. We'll hear first from Mr. Ebaugh. Good morning, Your Honors. And may it please the Court. We've raised a lot of challenges to the conviction and sanctions appeal, and this morning the Court has a great deal of briefing on these issues. This morning I'd like to focus on the denial of a motion to suppress. In short, Montemayor claims that the fact that a phone was registered and used by him established his standing alone, that there was no need for him to claim ownership of that phone. I don't want to distract you for long, but regardless of what we do with this argument, what actually happened at trial with the information that you're trying to suppress, the information was given to the jury that placed both defendants that are here on appeal at the different locations that this information identified, and this was introduced at trial, and was presented to the jury as proving that Montemayor and Serda were at the different locations at the different times. Is that correct? That's correct, Your Honor. I would say the briefing sort of skipped over that. I assumed that was what was going on. All right. Back to your argument about standing or whatever you were drawing. Thank you, Your Honor. It's right. Specifically, the phone number 956-600-9335, there was evidence introduced at trial in connection with counts 11, 12, and 13. All those counts had to do with the On that April 17, 2017 incident, they did have eyewitness testimony about what happened in connection with those carjackings, but there were some loose ends, and so the government really needed to have this cell site location information to help tie things together. And as I mentioned in the briefing, a closing argument, the government heavily relied on the fact that there was cell site location information that placed Mr. Montemayor at these carjackings. I do think what you acknowledge, that there was other evidence, is significant. Why isn't this other evidence sufficient, regardless of what we do with the argument about the cell phone information? Oh, why might it not be sufficient? Why isn't it non-presidential, harmless, if there's any error at all, because there's sufficient testimony placing both defendants in the locations that the cell phone information places? Well, just harking back to some of the circuit's precedent about how if it's a prison cell, that's it. It's a cell that it is significant. And in this case, the closing argument, the government argued, quote-unquote, we know that Nikki's phone number, that is Montemayor's phone number, 956-600-9335, we know that on April 7th, at 6.50 AM, that phone number was located on Caramon Avenue in the area of Los Niopas. It's very significant that the government relied on this and pointed out, apparently, they felt it was necessary in order to prove beyond a reasonable doubt. Because there was some inconsistency in the testimony in connection with that April 7th, 2017 carjacking. For instance, the victim, Mrs. Lorea, when she testified, she said that there was somebody that pointed a gun at her if they came out of a Malibu. But then you had one of the co-defendants, whose nickname was Coco, he claimed that he was driving a Grand Cherokee Jeep, and that he indeed was the one that pointed a pistol at Mrs. Lorea. Did they actually steal any cocaine or drugs from that event? They did. Okay. They did. What happened was, is the, Mrs. Lorea, tragic set of circumstances, she, and also very complicated, Mrs. Lorea, she lived in Mexico, and she apparently drove her two children over to the United States, dropped them off at school, and also at the same time, delivered cocaine in a spare tire. She delivered cocaine in a spare tire in her car, and also in a spare tire. That was the one with the two spare tires. That's correct. Oh, okay. All right. Yep. That is correct, Your Honor. Right. Because I got the impression that on some of these carjackings, they intended to steal drugs, but there weren't any. That, and that actually happened in the second fact pattern. Okay. What happened was, is that on this first fact pattern, which was April 7th, 2017, Mrs. Lorea, she was driving her two children to school, and also at the same time, transporting cocaine in the spare tire of her car, and in the spare tire of her son's car. They drove across the and... No, on all ears. It didn't mean to distract you. The... What is very significant in connection with this one fact pattern involving the denial of emotional surprise is that Mr. Montemayor's attorney actually admitted that the phone number that Mr. Montemayor had that day was in fact his, and that was being used that day was in fact his. And it's uncontested that this phone number, which ends with the last four digits, 9-3-3-5, that that was in fact a number associated with Mr. Montemayor. The attorney acknowledged it was registered with him. The only thing he didn't do is when Judge Alvarez asked him to admit that he had an ownership interest in it. That's the only thing he didn't do. The reason he didn't do that is because he was relying on the Fifth Amendment right against self-determination. Well, there are different words used in government briefs that are fairly strong about denial of ownership. What is the strongest statement you would say that counsel made on behalf of either one of these individuals that there was an actual denial of ownership as opposed to refusal to accept ownership? I mean, the government will have a more readily given answer, but I want to know what your answer is. What is the toughest part of your position in district court as to actually denying ownership? Well, the co-defendant, Mr. Cerda, his attorney in fact made an outright denial that any of the phone numbers were associated with him, but for Mr. Montemayor, he never made an outright denial. All he did is refuse to admit, refuse to admit that these numbers, the 9335 and the 7109 numbers, that they were in fact his numbers. But the government's evidence showed that they were in fact his numbers. There's a lot of evidence and there's a lot of evidence in the government's response brief to the motion to suppress. Is it awkward though for you to essentially ask us to assume that your client lied? That he lied about his numbers? About denying that it was his? Well, at no point in the record did he actually deny that they were his numbers. It's like answering an interrogatory neither admit nor deny. Or kind of like the . . . Isn't that awkward? It is awkward. We ask counsel in an interrogatory . . . the way these work is make things easier for the litigants. All right, let's figure out what's being disputed. He is putting in dispute that this is anywhere near his . . . within his possession. I'm honestly not sure what I think of this issue. I think it's interesting, but it is at least awkward to say that we're taking a position that you're arguing a position that seems inconsistent with your own client. I understand what you're saying. I think this is equivalent to like the SEC settlement agreements that they have where they neither admit nor deny. I mean, effectively they admit when they enter into such an agreement. Well, in the transcript of the discussion with the judge on this, it's . . . I don't know if you're talking to who it is, but I don't think the word awkward is used, but there is a discussion about . . . there's a little bit of dancing around this on the part of defense counsel. And doesn't it mean the issue for us is do we look at the overall evidence that's there to connect them, and if so, does that create the standing that is necessary or do you need an actual assertion? There's certainly evidence that was in the record to tie both defendants to individual phones, but is that enough? That was a question at the end. Is that enough? It is enough, yeah. It is enough. And specifically, I mean, Mr. Montemayor points the court's attention to, for instance, the United States v. Estolano's opinion in the Fourth Circuit, where in that court, the Fourth Circuit said that the defendant need not affirmatively present evidence of his legitimate expectation of privacy, rather he may simply point to specific evidence against the record which the government has presented and which establishes his standing. And that was done in this instance. For instance, when Mr. Montemayor's attorney acknowledged that the phone number Indian 9335 was actually tied to his client, that's all that was needed. Require more would ask him to incriminate his client. Can I move on to another one of your issues? Of course, Your Honor. That is the jury verdict form that seemed to meld possession and use of a firearm. Count two? Yeah. Yes. Thank you for asking that question, Your Honor. There are so many problems with that in count that I didn't know exactly how to frame it, so I apologize. Well, who represented Montemayor? Someone else represented him in the trial, right? That's correct. It was an attorney Brownsville that represented him in the trial.  I just didn't understand how the court could have confused those. Understandably, Your Honor. Yeah. We rely on a couple of different theories to challenge the way the indictment was written for count two. First, I want to point out the fact that there's six different versions of count two that occurred through trial. It's unbelievable. I've never seen anything like this. The compound error definitely amounts to error, and it certainly was prejudicial to Mr. Montemayor. It doesn't make Gilberry, or however the name is pronounced, hold that if there's sufficient evidence in the record to show, in fact, that there was use, not just possession, that that's sufficient. That you have error that is plain, you skip over affecting substantial rights is the way McGilberry did it. But it didn't look like there was any harm. It was prejudicial, which is not exactly the fourth factor, but nonetheless that's how he looked at it. Isn't there substantial evidence from other witnesses that the gun was actually used in this year-long conspiracy that's covered by the count that we're talking about? And what do you do with that if that evidence exists? Well, the problem is it violated his right to be indicted by a jury. But doesn't McGilberry talk about that? It doesn't say that you win just because indictment's wrong. You've got to show how that affected you. Understood. But Mr. Montemayor, he just simply relies upon a briefing about how the failure to require proof of each element violated his rights. All right, counsel, thank you. Okay, thank you. Yep. Mr. DeMaria? Good morning. Hello. May it please the Court, my name is Daniel DeMaria, and I represent Appellant Serda. Your Honors, this— Did I understand the exchange from my colleague and your other counsel? Neither one of you were counsel in trial court? No, Your Honor. All right, thank you. Your Honors, this Court must not countenance what happened in this case where a language other than English was spoken in court, and that was by the judge. And the judge's remarks in Spanish were not interpreted. And as the First Circuit Court of Appeals stated, it is clear to the point of transparency that federal court proceedings must be in English. And we take significant issue with what occurred in this case for three reasons. First, the fact that Spanish was spoken but not transcribed precludes effective appellate review, because we have no idea what the judge said. And of course, the words, speaks Spanish, that was not translated or whatever the words were, or only six words. We don't know how long the judge was speaking for, if it was minutes or lengthy, lengthy remarks or whatnot. And so we must not lose sight of that. Secondly, those jurors who did not speak Spanish may have been speculating as to what the judge was saying in Spanish, which may have caused them to believe that the judge was making remarks about the evidence. I simply can't imagine a jury would simply stand there not understanding what's happening without speculating in their mind and attempting to figure out what happened. Let me ask you, do you have any knowledge as to whether there were any non-Spanish speakers on the jury? I ask the court to take judicial notice of the fact that in McAllen, Texas, about 70 or 75% of the population speaks Spanish. So statistically, one in four would not have spoken Spanish. Though I do think, Your Honor, respectfully, that that's simply irrelevant. The whole crux of this is, even if they did speak Spanish, even if they did understand, myself, my co-counsel, this court, simply have no idea what was said. It seems to me the simplest— Is your point that this is essentially structural error, or do you have a theory of how this prejudice declined? I believe this is a structural error, Your Honor, and it's simply impossible to speculate at the amount of prejudice, given that we have no idea what was said, or what was done, or how the jury interpreted it. Let me ask you, counsel, in your brief, when you talk about the facts, you said there were several occasions when this happened, and you cite, I don't know, 20 different pages of the record. Does each of those pages just say, the judge spoke in Spanish, or something like that? I mean, some equivalent of that? Yes, Your Honor, except for one single instance where it seemed that the court reporter actually put one or two words that the judge was agreeing, or for every other instance, Your Honor is correct. And now my third point ties— Before we leave that point, then, as to the structural error theory, what's your best case? Because that's not something that's been held, right? Right, this is a novel— So you're arguing by analogy? This is a novel case, Your Honor. The close I would have is Rivera-Rosario from the First Circuit, where that appears to be what the court held in that case, that simply the fact that Spanish was spoken was fatal and required a retrial in that case. You're saying the First Circuit has found this structural, but that other circuits, we have not opined one way or the other? Right, I don't believe this has ever come up, Your Honors. I've done many trials, many appeals. I've never seen Spanish spoken in court, and I've never seen— Or without a translator. Pardon me, Your Honor? Spanish without a translator. Exactly. And the simplest thing would have been for the interpreter to simply interpret the Spanish. I don't know why he or she did not. That would have cured all of the— I'm sure you appreciate that courts are generally loath to find errors structural just because of the cost that's imposed on the system. Yes. We only do it in sort of the truly challenging cases. I agree with Your Honor, though I do think that this court ought to make sure that this simply does not happen. Going forward, this is such an easy thing to fix. Either the reverend speaks English, or if the judge or lawyer speaks Spanish, the interpreter interprets it. I agree it's not necessarily the hardest problem to fix. This should not have happened. But I don't know that deterrence alone is enough. The deterrence of district court procedure would result in a lot of things being structural error, a lot more than what we do now. Right. And, Your Honor, this is a very serious case. My client very likely will spend the rest of his life in prison barring intervention by this court. We owe it to my client that he have a fair trial. But I understand your point, but that's—prejudice analysis would take account of that, right? If your client should not go to jail and would not have gone to jail, or at least not that long, but for this translation problem, that would be a story you could tell. So in other words, you don't need structural analysis to take care of that problem, structural error analysis. I agree, Your Honor, but it's simply impossible for us sitting here to know what transpired in court, and that's what takes it to structural error, and that's why it's impossible to determine whether or not it was prejudiced. Well, the government, I thought, cited a whole bunch of references to the fact that the judge was saying something like, you may step down, have so-and-so been sworn in. I mean, where did they come up with those translations? That is not in the record, Your Honor. It's simply not in the record. It simply says, speaks Spanish, but it's not interpreted in the record. It doesn't actually say what the judge was saying. Well, if you had written a reply brief, it might have been more clear about that. Oh, Your Honor, I wrote a lengthy reply brief. You did? Yes, Your Honor. Okay. All right. I also ask the counsel at trial, if they spoke Spanish, would have known, perhaps would have known whether to object or not. How do we factor that in? They chose not to object, correct? So we are on plain air. If they understood Spanish and knew exactly what we were saying and knew it was something along the lines of what Judge Jones said, not interfering with the way the judge wanted to run her court when there were Spanish speakers around, I could see why not objecting. If something more serious was happening, why can't we rely on, if they indeed were Spanish speakers, why can't we rely on the attorneys to have monitored that and objected to it? Your Honor, first, I don't believe there's anything in the record as to whether or not— We could find out. I don't believe it would properly go outside the record. But let's say, for example, Your Honor, if we turn to page 792 of the record on appeal, it seems as though defense counsel made an objection. Objection, Your Honor. Then the judge speaks Spanish that is not interpreted. Then counsel says again, Objection, Your Honor. That's argumentative. So it seems as though legal argument, at least in that one instance at page 792— Are you objecting to the Spanish or are you objecting to something else? Not to the Spanish, to something else. What we know of the objection is that it was argumentative, but we don't know what the judge's reasoning was for overruling the objection. All right, counsel. Thank you. All right. Thank you, sir. Ms. Bari? Ms. Bari? Mystified as we are by some of the points raised here, I have to say I don't recall ever reading a government brief where the government was conceding so many errors. That is absolutely true, Your Honor. I will say that I have been before this court many times on cleaner prosecutions. However, this is what I have, and I would like to discuss the errors that can be affirmed today. I was not trial counsel, but— Well, I hope somebody gave a stern talking to trial counsel. We absolutely did, Your Honor. There was a moot court on it. There was training, and I can assure you that you will listen to the argument today. With respect to the standing issue, there are two phones involved here and two offenses linked to those two phones. There is the 7109 Berner phone that is associated with Montemayor, and that is related to count 16, which is the June 6th and 7th home invasion. Now, from his argument today and in his brief at page 17, Montemayor concedes there is no reasonable expectation of privacy in an unregistered phone. So what that means is that Agent Palmer and Bilson's testimony with respect to the 7109 phone comes in, and that's at records 1681, 1682, 2038, 2046, 2047, and 2116. So today we're only concerned with the 9335 phone number, and that's the phone number that was registered to Montemayor. It's implicated in counts 11, 12, and 13, and that's related to the April 7th carjackings. Now, the district court correctly applied the Supreme Court's ruling in Raikes, and that is that it is the defendant's affirmative burden to establish a legitimate expectation of privacy in the things searched or seized. By burdens, I just mean burden of proof. When you look at all the evidence in the record, somebody has that burden? Well, you look at—when we're looking at a suppression question, Your Honor, that would be prior to all the evidence at trial. This is not a trial. I'm talking about what was before the district court at the suppression hearing. What was before the district court at the suppression hearing was a consistent position taken that they did not take any— Well, understood, but what was the government's evidence or assertions at that same hearing? Our assertions were that we had 2703D orders for location, site information, and tower records that identified Montemayor. But what evidence did you have or assertions that these were the phones of these defendants? We had corroborating evidence from co-defendants' phones that tied to his phone, and we had also a ping that showed that this 9335 number was at his house. But in any event, Your Honor, even if the district court erred with respect to that 9335— Well, I'm not asking you to concede. I know you've got other issues to discuss, but I'm very interested in this. If we were looking at the total collection of evidence at the suppression hearing, is it fair to say there was significant evidence that would have tied these phones to these defendants? Oh, the 9-whatever-the-332 Montemayor? Yes, there's significant evidence in the records that were obtained from the cell service providers, not just in the location of the robberies, but the tower records as well. There was a lot of evidence that was before the court. That was the evidence, Your Honor, the location information and the tower records, and also the numbers from the other co-defendants at those locations. So there was multiple co-defendants all in those locations. Where are we, if we certainly haven't decided, but if were we to decide that that part of the decision was error, where are we? We are with the unrefuted testimony from co-conspirator Dellatore, which is unrefuted in either the principle or reply brief, and the jury was absolutely entitled to rely on it. Let me give the court the record site. That's 1580 to 1584. Dellatore testified with respect to this April 7th carjacking. Is that the only count we need this evidence for? That is the only count that is related to that phone number that was introduced at trial, Your Honor. Yes, there's three. There's 11, 12, and 13, and those are the only counts that were introduced as to that phone number. And Montemayor testified that the RIT crew, which includes – I'm sorry, excuse me. Dellatore testified that Montemayor was part of the RIT crew that carried guns and they stole seven kilos out of the spare tire before crashing the Explorer. The victim also testified that she saw an Explorer at the scene, 1791 to 1792. That is the loose end that defense counsel said was missing but failed to mention, and the jury is entitled to rely upon that co-conspirator's testimony. What was the loose end? I was writing something else down. What's the loose end? Oh, I was referring to counsel's argument today that there was some loose end. I know, but what is it? You identified what you thought. It is the Dellatore testimony, Your Honor, the testimony from the co-conspirator. Moving on to – excuse me. In count two of the firearm conspiracy, there is no doubt that this was not a clean charge, not a clean instruction. I assume the pattern jury instructions discriminate between those two, right? The pattern jury instruction 2.44, yes, Your Honor. There's 2.44B and there's 2.44A, yes. So with respect to this count on count two, the proper way that it should have read in the indictment was it should have said firearm possession conspiracy in furtherance of these predicate offenses. Instead, it read firearm possession conspiracy during and in relation to the predicate offenses. But the overwhelming evidence established that there was actually the higher activity, the higher burden on the government was shown such that the testimony showed that it wasn't just possession. It was conspiracy to use and brandish the firearm in furtherance of the predicate offenses. And that's what this court held in McGilvory. It's the exact same situation we have here, fourth prong, plain error. It's the exact same mistake also, isn't it? Yes. It makes me wonder what's floating out there that has this in it, but that's not today's argument. You know, Your Honor, I've seen it a few other times too. In fact, in the McGilvory case, they noted that there's very functional little difference if you have use but not possession, if they're flipped. But in any event, the overwhelming testimony establishes conspiracy to use and brandish. And I'm happy to go through each of the counts with the court to show those sites. But if not, I'll just pick out a few. So for counts five and six, Tovar testified. Record 587, excuse me, 757 to 758. Montemayor told him, we're being shot at. His car was riddled with bullets. Montemayor told Tovar, we're out of bullets. I'm out of bullets. With respect to counts 11, 12, and 13, Dellatore there again testified at records 1583 to 1584 that Montemayor carried a gun. Now, with respect to the jury instruction, that too had the wrong caption. The wrong caption in the title was flipped, but the instruction itself tracked the pattern jury charge. And again, with respect to the flipping of a predicate offense further in the instruction, what I mean by that is the jury instruction in the indictment said there was a firearm, there was a possession, conspiracy to possess a firearm, and the predicate offenses were conspiracy to possess with intent to distribute. But in the instruction, the predicate offense was possession with intent to distribute, not conspiracy. But again, the error is harmless, and here's why. The overwhelming evidence established the greater conduct. That is, the possession of cocaine and marijuana. Let me refer the court to those sites. Dellatore testified at 1581 and 1585. The group retrieved seven kilos of cocaine in the spare tire. Everyone carried a gun. Now, Dellatore also testified at record 1551 around the timeframe of November 2016. He was asked, what types of drugs does your group target? He answered marijuana and cocaine. With respect to the 7109 burner phone that was attributed to Montemayor that he does not challenge, there were pictures of large quantities of firearms and marijuana on that phone. Agent Palmer testified to that, records 2060 to 2061. Well, really all you need is the April 7 obtaining of seven kilos, right? Yes. That is absolutely correct, Your Honor. And that probably would go to our fourth prong, alimony error. One thing that . . . Well, that's a little more troubling to me. Okay. Just from the standpoint that we've been . . . illegal drugs. Yes, absolutely. And this is . . . we concede that there is Haynes error here. But under the fourth prong, I'd like to point these record sites out to the court because I think this shows why in this instance there's no fundamental unfairness. We argued that there was overwhelming evidence in our brief. We argued there was at least 21 kilos before the jury. But take a look, Your Honors, please. In records 2086 to 2087, 2130 and 2132, all parties during the jury charge conference agreed that a special interrogatory on jury quantity was not necessary based upon the quantity of drugs that were before the jury and admitted into evidence. I . . . Can I pick up something Judge Jones just asked you, Your Honor? There aren't that many definite rules that this court announces. But it does mean that we've gotten fairly settled that drug quantity needs to be decided by the jury. And I'm worried about starting to chip away at that. Is there something . . . you're talking about, you know, this agreement that nothing needed to be asked specifically about drug quantity. I'm trying to think of what would make this case special enough that we ought to make an exception. Well, you know, Your Honor, a Prendi error can be waived. And Al-Ani is an extension of a Prendi. And so that is how I would answer the court's question on that. And this is a fourth-pronged discretionary instance for the court. And I think based on the comments that were made at the jury charge conference, based upon the evidence that was admitted at least 21 kilos that I have listed out in the brief, I think that under the fourth prong of plain error would not be fundamentally unfair in this instance. With respect to the Spanish speaking, there's no harm in this case because there's no evidence that the jurors even had headsets for translation of the Spanish. To even understand what the Spanish was being spoken. The points that we have referred the court to are very important because the context of those Spanish, where he spoke Spanish, a witness wasn't on the stand. The witness was either coming off the stand or coming on the stand. He asked if they spoke Spanish. I'm sorry. Yes. Good job of us. Asked if the witness understood, if the witness needed a translator. Well, how do you know that? Because it tells you, it's right in the citation. I mean, I found their . . . I had looked at their reply brief and it just has a bunch of record sites. But in the regular brief, it said, likely asked if the witness spoke only Spanish or could understand English. And then it cites 1, 2, 3, 4, 5. And then at one point, the judge interrupted a witness's testimony to act as an interpreter for some reason. It suggests that. And then, you know, there are no details for a number of the other references. Well, it seems that you can glean that. It's definitely not a situation like in Rivera, which is the main case which I rely on, where blocks of testimony were taken in Spanish. What you'd be concerned about, though, is that she said something like, that was very convincing, that the witness was getting off the stand, or what a traumatic experience you went through. Well . . . I wouldn't think she would have said that, but when you just look at when the statements were made, you can't really say it was just benign departure statements. Well, in that case, Your Honor, we're under plain error of you. And counsel did speak Spanish. So I would hope that in that instance, if the judge were to say, that was a very convincing testimony, boy, I hope you listened to this jury, that was really good. I would certainly hope that defense counsel would stand up and object to that. How do we know defense counsel was Spanish-language? I understand that all three counsels did speak Spanish. I don't have that in the record. I don't have that right for records . . . Or should we get that in the record? There's some names. Would that be a way to proceed? That would be as a way to see if there was maybe why there wasn't a . . . Maybe it was because they spoke Spanish and they couldn't get the English jury instructions right. Anyway, moving along. There are other issues, but they haven't been addressed here. If the court has any other questions, I would like to point out that some of the sufficiency issues that CERDA attempts to adopt, this court has held, you cannot adopt under 28I any sufficiency issues raised by another party. Therefore, I argue that is waived, any of the issues that implicate fact questions and sufficiency questions tied directly to Montemayor. If there are no further questions, I would respectfully rest on our briefs. The government would request that the counts be vacated and remanded, those of which we conceded to, and the rest of the judgment be affirmed. All right. Thank you. Would you hold on just one minute? I'm sorry, Chief. Yes, Your Honor. Madam Presider, let me look at some notes here. I guess that's all. Thank you, Counsel. Okay, Mr. Ebaugh. Thank you, Your Honors. I apologize. When I got back and sat down, I was able to think about Judge Southwick's question a little bit more about prejudice resulting from the errors in count two. I think one of the primary prejudices that Mr. Montemayor suffered is that the verdict sheet for count two, it says that he committed, or it says that one of the predicate offenses that that conviction is based on is actually for a predicate offense that the government has acknowledged there was insufficient evidence for. In the verdict sheet for count two, the predicate offense was conspiracy to possess with intent to distribute a controlled substance to with a mixture or substance containing a detectable amount of cocaine and marijuana. The government sort of conceded that there was insufficient evidence that such a violation actually occurred, and that's count 17. So this is used in the same language. So because of that, this is direct evidence for the prejudice and all the confusion around the wording of count two. Unless the court has any more questions. Are you talking about count two in the indictment or in the jury charge? I'm talking about count two in the jury charge. Right. Count two in the jury charge. So count two in the jury charge, and of course it's a generally accepted rule that the jury charge has to be read in conjunction with the verdict sheet. Right. And like I said, here in the verdict sheet that you're referring to an offense, the predicate offense, the government conceded that there was insufficient evidence to support. Thank you. Do you know for a fact whether Mr. Montemayor's trial counsel spoke Spanish? I'm sorry, Your Honor. I don't know. I'm happy to investigate a supplement if this court would like. We'll find out. Thank you. Your Honor, I just heard Your Honor say we'll find out as to whether or not counsel spoke Spanish. And I respectfully say that the only way to get that before the court would be Federal Rule of Appellate Procedure 10E. But that is simply a mechanism to supplement the record to reflect what actually happened in court. It's not a means to put additional evidence before the court. And so respectfully, I do not think that is something that the court can go outside the record to ascertain or determine. And there simply is nothing in the record. I've looked long and hard. I couldn't find anything as to whether or not they spoke Spanish. Counsel for government made reference to a headset, and the jurors, given that the judge would have been speaking Spanish, untranslated. I don't think that has anything to do with headsets. I don't think jurors wear headsets. And again, I don't believe any of that's in the record either. Your Honor made a very good point. The judge made a brief remark that was convincing or that was unconvincing. But I would take it one step further. Again, I believe it's a natural human tendency, when someone can't hear correctly, someone speaks too softly or someone speaks a different language. There's a tendency to guess, what is this person saying? I do not understand. I want to understand. I cannot ask a question. And so while the judge probably did not actually say that, it is certainly possible, maybe even likely, for the jurors to have speculated, hey, what did he or she say and have gotten it completely wronged in their mind. And it may also be during jury deliberations that perhaps a juror who spoke Spanish told a non-English speaking juror, hey, the judge had said this. You didn't understand it. You should try and sway. But we don't go beyond the jury. We don't pierce jury deliberations. You're just speculating. I am speculating, Your Honor. And we ought not to be speculating. But given what occurred in this case, the government simply speculating as to what happened. I put every single untranslated instance in my record. Have you handled many cases that come off the border court? I'm sorry, Your Honor? Have you been involved in many cases that come off the border court, Laredo, McAllen? I had one case in Laredo. But it was simply tied to proceedings from out of state. OK. So it may be different, Your Honor. But as Judge Poe had stated, this is a problem that's very, very easy to cure, even if it is a border state. And again, the simplest solution may simply be that the interpreter interpret what the judge says. Then we don't have any problem at all. Right. OK. Thank you. Do you have your argument? Do you want them to explore this matter? Why don't we get back to them? We'll let you know about any further information we might want and in what form. OK. Thank you very much, Mr. Ibarra. You are court appointed, and we certainly appreciate your service. Thank you. You weren't appointed, were you, Mr. DeMaria? Oh, OK. Yeah, I didn't think so. We appreciate you also. Ms. Bari isn't appointed either, so good work. Thank you.